# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOSE L. VIVAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) No. 06 C 3566 |
| | ) |
| THE BOEING COMPANY, | ) Consolidated with |
| a corporation; UNITED TECHNOLOGIES | ) |
| CORPORATION, a corporation, individually | ) No. 06 C 3567 |
| and doing business as PRATT & WHITNEY; | ) No. 06 C 3568 |
| and TRANSPORTE AEREOS NACIONAL | ) No. 06 C 6807 |
| DE SELVA, S.A., a sociedad anonima, | ) No. 07 C 0683 |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This is a tort case arising out of a plane crash in Peru. Now before the court is the motion of defendant Transporte Aereos Nacional de Selva, S.A., also known as Aerolinea TANS Peru ("TANS") to dismiss it from this case. Dkt. No. 55. TANS argues, *inter alia*, that it is immune from jurisdiction in the courts of the United States and of the several States under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 *et seq.* (2000).

The original plaintiffs[1] filed seven different complaints in the Circuit Court of Cook County against defendants the Boeing Company ("Boeing"), United Technologies Corporation ("UTC"), and TANS, which were all removed and consolidated before this court. Plaintiffs moved to remand based on a lack of federal question jurisdiction and diversity jurisdiction. Dkt. Nos. 12, 50. On March 12 of this year, the court granted those motions for the cases in which the

---

[1] Originally, there were approximately 30 plaintiffs in this consolidated case. There are now ten. The six Vivas plaintiffs are citizens of New York and the other four plaintiffs are citizens of Peru.

plaintiffs had not sued TANS. Dkt. No. 95.[2] TANS, however, had raised the FSIA as an additional basis for removal under 28 U.S.C. § 1441(d). Dkt. No. 67. The court therefore retained those cases in which TANS was named in order to consider the instant motion. For the reasons that follow, TANS's motion to dismiss is granted. TANS will be dismissed, and all of the cases remaining in this court will be remanded to the Circuit Court of Cook County.

I.      Jurisdictional Facts

TANS was created as the state air carrier of Peru pursuant to Peruvian Supreme Decree in 1963. TANS's Motion to Dismiss, Dkt. No. 55, Ex. 2A (Letter from Peruvian Minister of Economy and Finance Fernando Zavala Lombardi) ("Zavala letter"), at 2; Ex. 1 (Declaration of Miguel Angel Vasquez, Peruvian government employee and Liquidator for TANS) ("Vasquez Decl."), at ¶ 2; Ex. 1A (Supreme Decree No. 17).[3] Transporte Aereos Nacional de Selva translated into English means "national air carrier of the jungle." TANS provides access to areas of the country where there was previously little developed infrastructure and to which there was little access. Zavala Letter, at 2. It also serves as the Presidential aircraft fleet and as a carrier to transport military troops to various parts of the country in times of unrest, natural disaster or foreign threat. *Id.* All TANS pilots are required to be current members of Peru's Air Force. *Id.*

---

[2] Plaintiffs in the Rengifo (06 C 4437) and Rojas de Moral (06 C 4565) cases did not sue TANS. Those cases were therefore remanded to the Circuit Court of Cook County.

[3] Plaintiffs argue that the court should disregard the Zavala letter because if the letter is considered, the court should convert this motion to one for summary judgment. Furthermore, they argue, unauthenticated or unverified documents cannot be considered on motions for summary judgment. They cite Fed. R. Civ. P. 56(e). First, the motion will not be converted to one for summary judgment because the court can consider evidence outside of the complaint on a Rule 12(b)(1) motion, as noted below. Second, TANS has obtained an authenticated copy of the Zavala letter. TANS's Reply Memorandum, Dkt. No. 55, Ex. I. This argument is therefore not persuasive.

Before 1999, TANS was owned directly by the Peruvian Ministry of Transportation. *Id.* In 1999, however, Peru ordered all government entities holding shares in any companies on behalf of the Peruvian government to transfer them to a new entity that was to be charged with owning and managing all state-owned enterprises: the Fondo Nacional de Financiamento de la Actividad Empresarial del Estado, or "FONAFE." *Id.* at 1-2. FONAFE's name translated into English is "National Fund for the Financing of State Entrepreneurial Activity." *Id.* at 1. FONAFE now owns 100 per cent of TANS's shares. *Id.* at 2. TANS's general manager (its highest officer) is appointed by FONAFE. FONAFE relays orders from the government to TANS regarding TANS's administration and operation. *Id.* FONAFE dictates and supplies TANS's budget. *Id.* Any profits made by TANS are transferred to FONAFE, which in turn transfers them to the state treasury. *Id.* To the extent that TANS is unable to generate sufficient revenue to operate, additional funds are provided by the state. *Id.* TANS is subject to certain Peruvian laws that are applicable only to government entities. Declaration of Doctora Aissa Paredes, TANS's Motion to Dismiss, Dkt. No. 55, Ex. 2 ("Paredes Decl."), at ¶ 4.

Prior to FONAFE's inception, its tasks were conducted by the Peruvian government through the now defunct Office of State Institutions and Organisms. Zavala letter, at 1. FONAFE's board is comprised of Zavala, who is the Chairman; the Minister of State; the Minister of Transport and Communications; the Minister of Housing, Construction and Sanitation; and the President of Ministerial Advice. *Id.* The Ministry of Economy and Finance directs FONAFE's management and budget. *Id.* All property owned by FONAFE is held exclusively on behalf of and for the benefit of the state. *Id.* FONAFE can enter into contracts on behalf of and for the benefit of the state. *Id.* According to Zavala, FONAFE is a sub-division of

3

the Peruvian government. *Id.* FONAFE is regulated by the Public Laws of the State of Peru, which are applicable only to entities owned and controlled directly by the state. *Id.*

By means of Supreme Decree on July 15, 2006, the Peruvian government initiated the process of liquidating TANS. Vasquez Decl., at ¶ 3, Ex. 1B.

## II. Discussion

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Filler v. Hanvit Bank*, 378 F.3d 213, 216-17 (9th Cir. 2004) (citing, *inter alia*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993)). It provides that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604.[4]

TANS joined in Boeing's notice of removal, citing section 1441(d) of the Judicial Code as an additional basis for this court's jurisdiction, which provides, "Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court

---

[4] Under the FSIA, "both statutory subject matter jurisdiction ... and personal jurisdiction turn on application of the substantive provisions of the [FSIA]. Under [28 U.S.C.] § 1330(a), federal district courts are provided subject matter jurisdiction if a foreign state is 'not entitled to immunity either under sections 1605-1607 ... or under any applicable international agreement;' § 1330(b) provides personal jurisdiction wherever subject matter jurisdiction exists under subsection (a) and service of process has been made under § 1608 of the Act. Thus, if [an entity qualifies as a "foreign state" and] none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983).

4

without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown." 28 U.S.C. § 1441(d).[5] TANS also filed this motion to dismiss.

A case may be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). "If subject matter jurisdiction is not evident on the face of the complaint, the motion to dismiss pursuant to Rule 12(b)(1) would be analyzed as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true. However, if the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction, the movant may use affidavits and other material to support the motion." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 945 (7th Cir. 2003) (citations omitted). The burden of proof is on the party asserting jurisdiction, and the court is free to weigh evidence to determine whether jurisdiction has been established. *Id.* *Brown v. American Family Ins. Group, Inc.*, 2007 WL 1119210, at *3 (N.D. Ill. April 11, 2007). This is so in the case of the FSIA as well: "The party claiming FSIA immunity bears the initial burden of proof of establishing a *prima facie* case that it satisfies the FSIA's definition of a foreign state. Then the burden of going forward shifts to the plaintiff to produce evidence that the entity is not entitled to immunity. The ultimate burden of proving immunity rests with the foreign state." *Enahoro v. Abubakar*, 408 F.3d 877, 882 (7th Cir. 2005) (citations omitted).

The definition of "foreign state" is found in section 1603 of the FSIA:

---

[5] Plaintiffs moved to strike TANS's joinder and supplement to Boeing's notice of removal on the basis that it was untimely. Dkt. No. 72. Because TANS alerted plaintiffs in its earlier-filed motion to dismiss that it would be supporting Boeing's notice of removal, the joinder was only one day late, and the time for removal may be enlarged "at any time for cause shown" under 28 U.S.C. § 1441(d), the court will deny this motion.

5

> For purposes of this chapter--
>
> (a) A "foreign state", except as used in section 1608 of this title, includes a **political subdivision** of a foreign state or an **agency or instrumentality** of a foreign state as defined in subsection (b).
> (b) An "agency or instrumentality of a foreign state" means any entity--
> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an **organ of a foreign state or political subdivision thereof**, *or* a majority of whose shares or other ownership interest is **owned by a foreign state or political subdivision thereof**, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603 (emphasis added).

It is undisputed that TANS is not itself a foreign state or political subdivision thereof under section 1603(a). Therefore, it can qualify as a "foreign state" only if it is an "agency or instrumentality" under section 1603(b). Plaintiffs do not challenge TANS's fulfillment of the first and third prongs of section 1603(b), *i.e.*, that it is a separate legal person and that it is neither a citizen of a State of the United States nor created under the laws of any third country. Additionally, plaintiffs concede that FONAFE owns 100 per cent of TANS's shares. Therefore, whether TANS is an "agency or instrumentality" turns on whether (1) TANS is an "organ" of Peru or of a political subdivision of Peru; or (2) FONAFE is a political subdivision of Peru. If the answer to either question is yes, TANS qualifies as a "foreign state," and removal was proper. If the answer to both questions is no, TANS is not a foreign state and this court does not have jurisdiction over the case. *See Wong ex rel. Leung Yuen Man v. Boeing Co.*, 2003 WL 22078379, at *2 (N.D. Ill. Sept. 8, 2003).

The Supreme Court has recently addressed the requirements for an entity to qualify as an agency or instrumentality of a foreign state under the ownership prong of section 1603(b)(2). In

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 478, 123 S. Ct. 1655, 155 L. Ed. 2d 643 (2003), the Court held that a "corporation is an instrumentality of a foreign state under the FSIA only if the foreign state *itself* owns a majority of the corporation's shares." (Emphasis added.) In *Dole*, two companies, Dead Sea Bromine Co., Ltd., and Bromine Compounds, Ltd., asserted immunity as instrumentalities of the State of Israel. *Id.* at 471-72. The State of Israel wholly owned Israeli Chemicals, Ltd., which owned a majority of shares in Dead Sea Works, Ltd., which in turn owned a majority of shares in Dead Sea Bromine Co., Ltd., which owned a majority of shares in Bromine Compounds, Ltd. *Id.* at 473-74. Therefore, "the State of Israel owned a majority of shares, at various times, in companies one or more corporate tiers above the [two companies asserting instrumentality status], but at no time did Israel own a majority of shares in [those two companies]." *Id.* at 475. Based on these facts, the Court affirmed the denial of foreign sovereign immunity. *Id.* at 477.

In cases where a company is not directly owned by a foreign state or a political subdivision thereof, and therefore would not fulfill the requirements for being majority owned by the state under the ownership prong of section 1603(b)(2) and *Dole*, several circuit courts have considered whether that company could nevertheless qualify as an agency or instrumentality under the organ prong of section 1603(b)(2). This inquiry does not involve an analysis of the entity's ownership structure. *See, e.g., USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 208 (3rd Cir. 2003) ("A flexible approach [to determining organ status] is particularly appropriate after *Dole*, inasmuch as courts likely now will be asked to evaluate the possible organ status of a wide variety of entities controlled by foreign states through tiering arrangements and because of the widely differing forms of ownership or control foreign states may exert over entities."). The *USX*

7

court held that an insurance company was an organ of the Republic of Ireland under section 1603(b)(2) where Ireland had "complete control over all shares of [that entity], albeit through a tiered arrangement involving civil servants who [held] their interests in trust for the [government]." 345 F.3d at 213-14.[6] *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2nd Cir. 2004) assumes the same logic, as do the pre-*Dole* cases of *EIE Guam Corp. v. Long Term Credit Bank of Japan*, 332 F.3d 635, 639 (9th Cir. 2003); *EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 997-99 (9th Cir. 2001) ("Even though a majority of [an entity's] shares are not directly held by [the state], it is still possible for it to be an organ of a foreign state as defined by § 1603(b)(2)."); and *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846 (5th Cir. 2000) ("because we conclude that Al Furat is an organ of a foreign state, we need *not* consider § 1603(b)(2)'s ownership requirements.") (emphasis in original).

There is no clear test for determining agency or instrumentality status under the organ prong of section 1603(b)(2). Courts have flexibly applied similar criteria, including the following factors: (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) its independence from the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state

---

[6] In *Dole*, the Supreme Court noted that "[m]ajority ownership by a foreign state, not control, is the benchmark of instrumentality status," and that it was irrelevant whether the state controlled the companies asserting that status. 538 U.S. at 477. The possibility of organ status as an alternative to direct state ownership was not considered by the Supreme Court in that case, however, so it is not clear that the Court had the criteria for being an organ in mind when making those statements. The Ninth Circuit had found that the companies did not satisfy the criteria for organs, *Patrickson v. Dole Food Co., Inc.*, 251 F.3d 795, 808 (9th Cir. 2001), and its rationale is discussed further below. Requiring an organ to satisfy the criteria for being owned by a foreign state would read the word "or" out of 28 U.S.C. § 1603(b)(2), which this court will not assume that the Court meant to do. Furthermore, in the recent case of *Powerex Corp. v. Reliant Energy Services, Inc.*, – U.S. –, 127 S. Ct. 2411, 2425, 168 L. Ed. 2d 112 (2007), Justice Breyer in his dissent considered the question of whether an indirectly owned entity which would not satisfy *Dole*'s criteria for the ownership prong of section 1603(b)(2) could alternatively satisfy the organ prong. Breyer would have found that an indirectly owned entity *could* be (and was in the *Powerex* case) an organ. *Id.* The majority did not reach the question because they resolved the case on other jurisdictional grounds.

8

requires the hiring of public employees and pays their salaries; (6) the entity's obligations and privileges under the foreign state's laws, and; (7) the ownership structure of the entity. *See, e.g., Powerex Corp. v. Reliant Energy Services, Inc.*, – U.S. –, 127 S. Ct. 2411, 2425, 168 L. Ed. 2d 112 (2007) (Breyer, dissenting); *Filler*, 378 F.3d at 217; *EOTT*, 257 F.3d at 997; *RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208, 1215 (D. Colo. 2004) (citing *USX Corp.*, 345 F.3d at 209); *Kelly*, 213 F.3d at 846-47. This flexible approach is supported by the legislative history of the FSIA, as reflected in the following statement: "As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name." H.R. Rep. No. 94-1847, at 15-16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6614.

The most efficient way to determine TANS's agency or instrumentality status in this case is to first examine whether TANS is an organ of the State of Peru.[7] The circumstances of TANS's creation and termination – both by Supreme Decree of the government of Peru – weigh heavily in favor of it being an organ, as do all of the other factors listed above. It appears to serve in a similar role to what is commonly referred to as the United States' Air Force One. Additionally, it serves the government's public purposes of transporting military personnel and providing general access to remote areas of the country. TANS has little operational or financial

---

[7] Plaintiffs construe TANS's organ arguments as arguing that TANS is an organ of FONAFE. The court, however, understands TANS to be arguing that it is an organ of the state directly.

9

autonomy. It takes orders from the government through FONAFE. It is wholly owned by the government[8] and is financially inseparable from it; money flows from the state to TANS and then straight back again. Peru requires that all TANS pilots be members of the Peruvian Air Force, which means that they are state employees and are paid from the state treasury.

Plaintiffs argue that TANS cannot be an agency or instrumentality because it is able to contract in its own name, and because in some of its contracts, it characterizes the purpose of the contract as private and commercial, agrees to be subject to all applicable laws with respect to its obligations under the contract, and commits that it will not assert governmental immunity as a defense to its obligations under the contract. *Vivas Plaintiffs' Limited Response*, Dkt. No. 98, at 7. An entity that acts and is suable in its own name was specifically enumerated as an example of an agency or instrumentality in the legislative history of the FSIA, however. *See* H.R. Rep. No. 94-1847, at 15-16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6614. And as TANS points out, no company would be likely to enter into a contract with it if it did not agree to be bound and suable under that contract. Therefore, these facts do not weigh strongly against a finding that TANS is an organ for purposes of the FSIA. The court finds that TANS has made a *prima facie* case that it is an organ, and thus an agency or instrumentality of the Peruvian government.

A comparison of other cases finding entities to be organs under section 1603(b)(2) confirms that TANS fits easily into the category. "The federal courts have recognized as organs such quasi-public entities as national banks, state universities and public television networks."

---

[8] It is unnecessary to determine whether TANS is directly or indirectly owned by Peru, which would require the court to decide whether FONAFE is a political subdivision or an agency or instrumentality of the government.

10

*EOTT*, 257 F.3d at 997.[9] Regarding state-owned airlines in particular, the court in

*Shirobokova v. CSA Czech Airlines, Inc.*, 335 F. Supp. 2d 989, 990-91 (D. Minn. 2004), found

that an airline, which had been continuously owned and operated by the government of the Czech

Republic or its predecessors, served as the state carrier of the former Czechoslovokia, and was 91

---

[9] The *EOTT* court described previous Ninth Circuit cases:

> In *Gates* [v. *Victor Fine Foods*, 54 F.3d 1457, 1460-61 (9th Cir. 1995)], we held that an industry board that regulated the Canadian pork market was an organ where it exercised regulatory authority delegated by the government; its decisions could be appealed to a government agency; and its members enjoyed immunity from suit for their official duties.... even though the government was not involved in the day-to-day activities and the board was supported by fees levied upon the hog producers.... In *Corporacion Mexicana de Servicios Maritimos v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996), we held that a Mexican oil refinery was an organ where it was entirely owned by the government; controlled by government appointees; employed only public servants; and had the exclusive responsibility for refining and distributing Mexican government property.

*EOTT*, 257 F.3d at 997 (internal citations omitted). As contrast, the court continued:

> More recently, in *Patrickson* [v. *Dole Food Co., Inc.*, 251 F.3d 795, 805], we held that two chemical companies, the "Dead Sea Companies," were not organs. The Dead Sea Companies were ... classified as "government companies" under Israeli law and the government had various privileges reflecting its ownership stake. The government had the right to approve the appointment of directors and officers, as well as any changes in the capital structure of the Companies, and the Companies were obligated to present an annual budget and financial statement to various government ministries. The government could constrain the use of the Companies' profits as well as the salaries of the directors and officers. Despite [this], we held that it was a "close question" but that these companies were not organs. We reasoned that the Israeli government's control is not considerably different from the control a majority shareholder would enjoy under American corporate law. In contrast to the oil refinery in *Corporacion Mexicana*, the Dead Sea Companies were not run by government appointees; their employees were not treated as civil servants; nor were the Companies wholly owned by the government of Israel. The Companies could sue and be sued, and could in fact sue the government of Israel .... [Those] factors support[ed] the ... view of the Companies as *independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives.*

*EOTT*, 257 F.3d at 998 (internal citations and quotation marks omitted; emphasis added by the Ninth Circuit). Furthermore, in *Kelly*, the Fifth Circuit held that Al Furat Petroleum Company, which was a private, non-profit company indirectly owned in part by the Syrian government, formed pursuant to a presidential decree with the purpose of developing identified petroleum reserves in Syria, had half of its board appointed by a directly and wholly owned Syrian State company (and those directors were invariably Syrian government officials), and was required to turn over all minerals found to the state, was an organ for FSIA purposes. 213 F.3d at 847-48. Similarly, in *RSM Prod. Corp.*, the court held that Petroleo, the wholly-owned subsidiary of the state-owned oil company of Venezuela was an organ. 338 F. Supp. 2d at 1215. Petroleo was created under a resolution issued by the government to be an instrument of the Venezuelan State's oil policy, was required to follow the policies, guidelines, direction, and public law of the government, and was indirectly but completely owned by the government. *Id.*

11

per cent owned (albeit indirectly) by the government of the Czech Republic, qualified as an organ.

The court's finding here is superficially at odds with the case of *Wong v. Boeing Co.*, 2003 WL 22078379, at *1 (N.D. Ill. Sept. 8, 2003), where Judge Manning addressed a situation very similar to the one presented here: China Air, a Chinese airline, was majority owned by a non-profit foundation whose purpose was the promotion of the country's aviation industry. China Air asserted immunity as a majority-owned subsidiary of the non-profit foundation, which it alleged was a political subdivision of the People's Republic of China. *Id.* at *3. The court found that the non-profit was not a political subdivision and that therefore China Air did not qualify as an agency or instrumentality under the ownership prong of section 1603(b)(2). *Id.* at *6. The court did not go on to consider in the alternative whether China Air could be an organ of the state. In its introduction, however, it stated that "China Air does not contend, under subsection (b)(2), that it is 'an organ of a foreign state or political subdivision thereof,' but rather premises its argument on the subsection's 'majority ownership' clause." *Id.* at *2. Therefore, *Wong* is not in real conflict with the court's holding here.

TANS has made, as an alternative to its organ argument, the same ownership argument that China Air made in *Wong*. That is, because it is 100 per cent owned by FONAFE, it qualifies as an agency or an instrumentality of Peru under the ownership prong because FONAFE is a "political subdivision" of Peru. This argument is unaffected by *Dole*, because TANS would be taking only the statutorily permitted one step down from the state instead of the *Dole*-prohibited two steps down. *Wong*, 2003 WL 22078379, at *3. Analyzing this, however, would require the court to debate the merits of competing tests for determining political subdivision status. *See*

12

*Wong*, 2003 WL 22078379, at *4 (comparing the "core function" test with the "legal characteristics" test, and citing cases); *see also Garb v. Republic of Poland*, 440 F.3d 579 (2nd Cir. 2006); *Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001). Because the court has already found TANS to be an agency or instrumentality of Peru under the organ prong, there is no need to address this question here. The court does note, however, that it would seem untrue to the intentions of the FSIA to strip TANS of ownership status merely because the government of Peru transferred TANS from the Ministry of Transportation, which previously held its shares, to FONAFE, which now holds all shares of Peruvian state-owned enterprises, an action which might have been influenced by the suggestions of the World Bank. *See* TANS's Reply Memorandum, Dkt. No. 100, at 8-11.

After TANS made its *prima facie* case that it is an agency or instrumentality of Peru, the burden of production shifted back to plaintiffs to prove that TANS is not entitled to immunity, such as under one of the exceptions enumerated in sections 1605-1607. *Kelly*, 213 F.3d at 847; *Haven v. Rzeczpospolita Polska*, 68 F. Supp. 2d 947, 951 (N.D. Ill. 1999). Plaintiffs have made no attempt to make such a showing. Regardless, it appears that the only conceivable exception that could apply is 28 U.S.C. § 1605(a)(2), which provides: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States ...." But this court's brief research shows that the survivors of people killed in a plane crash abroad do not sustain the sort of injuries intended to be covered by section 1605(a)(2). *See Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 379 (7th Cir. 1985) (citing

13

*Australian Government Aircraft Factories* v. *Lynne*, 743 F.2d 672, 674-75 (9th Cir. 1984) (injuries to pilot's family in United States are indirect consequence of plane crash in Indonesia and insufficient to support jurisdiction under direct effect exception of § 1605(a)(2))); *Keller* v. *Transportes Aereos Militares Ecuadorianos*, 601 F. Supp. 787, 789 (D.D.C. 1985).

### III. Conclusion and Order

For the reasons stated above, the court finds that TANS qualifies as a "foreign state" under 28 U.S.C. § 1603(b)(2) and there has been no showing that any exception to immunity applies. Therefore TANS is immune from the jurisdiction of this court and the Circuit Court of Cook County under 28 U.S.C. § 1604. TANS's motion to dismiss [# 54, #55] is granted and TANS is dismissed from this case with prejudice. Plaintiffs' motion to strike TANS's joinder and supplement to Boeing's notice of removal [# 72] is denied. Plaintiffs' recently-filed motions to sever [# 107, # 108] are denied as moot, as are plaintiffs' motions to amend the complaint and for other relief [# 113, 115]. There is no need to consider TANS's objection to service. Because there is no remaining basis for federal jurisdiction, all of the consolidated cases that remain in this court are hereby remanded to the Circuit Court of Cook County. This case is terminated.

Dated: August 21, 2007               ENTER:

                                     JOAN HUMPHREY LEFKOW
                                     United States District Judge

14